**Westlaw.**

--- Fed.Cl. ----  
--- Fed.Cl. ----, 2006 WL 3703119 (Fed.Cl.), 98 A.F.T.R.2d 2006-8212  
**(Cite as: --- Fed.Cl. ----)**

Page 1

**H**  
Briefs and Other Related Documents  
Suess v. U.S.Fed.Cl.,2006.  
United States Court of Federal Claims.  
C. Robert SUESS, et al., Plaintiffs,  
v.  
The UNITED STATES, Defendant.  
**No. 90-981 C.**

Dec. 13, 2006.

**Background:** Shareholders of failed thrift brought against United States derivatively and individually, alleging that the passage of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) breached contractual promises by government regulators regarding regulatory treatment of goodwill created from two acquisitions. After entry of summary judgment in favor of plaintiffs on liability, the Court of Federal Claims, 52 Fed.Cl. 221, awarded damages to plaintiffs in the amount of $34,672,500. Parties filed motions for reconsideration.

**Holdings:** The Court of Federal Claims, Smith, Senior Judge, held that:

(1) judgment awarding shareholders the thrift's market value on date of breach as damages for government's breach of supervisory merger contracts would be amended to add a 50% control premium to individual share price;

(2) shareholders failed to establish that damages award should be adjusted for informational leakage by measuring thrift's market value on day after the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) was proposed; and

(3) it was not appropriate to compensate shareholders for $50 million tax settlement paid by thrift for taxes incurred while in receivership.

Plaintiff's motion granted in part and denied in part; defendant's motion denied.

[1] Federal Courts 170B ⚖ 1121

170B Federal Courts

    170BXII Claims Court (Formerly Court of Claims)  
        170BXII(B) Procedure  
            170Bk1121 k. Post-Decision Relief; Further Proceedings After Interlocutory Determination. Most Cited Cases  
"Catch-all" provision of relief from judgment rule is only available in extraordinary circumstances and only when the basis for relief does not fall within any of the other subsections of the rule. RCFC, Rule 60(b)(6), 28 U.S.C.A.

[2] United States 393 ⚖ 74(13)

393 United States  
    393III Contracts  
        393k74 Rights and Remedies of Contractors  
            393k74(12) Damages and Amount of Recovery  
                393k74(13) k. Breach of Contract in General. Most Cited Cases  
Judgment awarding shareholders of failed thrift the thrift's market value on date of breach as damages for government's breach of supervisory merger contracts would be amended to add a 50% control premium to individual share price, as the unadjusted individual share price merely reflected partial ownership of thrift.

[3] United States 393 ⚖ 74(13)

393 United States  
    393III Contracts  
        393k74 Rights and Remedies of Contractors  
            393k74(12) Damages and Amount of Recovery  
                393k74(13) k. Breach of Contract in General. Most Cited Cases  
Shareholders who prevailed in suit for breach of supervisory merger contracts failed to establish that damages award of thrift's market value on last business day prior to enactment of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) should be adjusted for informational leakage by measuring thrift's market value on day after FIRREA was proposed, absent evidence demonstrating that pre-breach information regarding FIRREA had been disseminated, that the market reacted to such information, and that it had a measurable effect on thrift's market price. Financial Institutions Reform, Recovery, and Enforcement Act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Fed.Cl. ----                                                                                                  Page 2
--- Fed.Cl. ----, 2006 WL 3703119 (Fed.Cl.), 98 A.F.T.R.2d 2006-8212
(Cite as: --- Fed.Cl. ----)

of 1989, § 202 et seq., 12 U.S.C.A. § 1811 et seq.

**[4]** United States 393 ⚿74(13)

393 United States
   393III Contracts
      393k74 Rights and Remedies of Contractors
         393k74(12) Damages and Amount of Recovery
            393k74(13) k. Breach of Contract in General. Most Cited Cases

It was not appropriate to increase damages award to shareholders of failed thrift who prevailed in suit for breach of supervisory merger contracts to compensate them for $50 million tax settlement paid by thrift for taxes incurred while in receivership, on theory that tax liability resulted primarily due to receipt of Federal Financial Assistance (FAA), and thus was incurred as consequence of breach; because FFA was not a loss to receivership but a gain, $50 million tax settlement could not be treated as a compensable cost.

**[5]** United States 393 ⚿74(13)

393 United States
   393III Contracts
      393k74 Rights and Remedies of Contractors
         393k74(12) Damages and Amount of Recovery
            393k74(13) k. Breach of Contract in General. Most Cited Cases

It was not appropriate to offset surplus from receivership of failed thrift against damages award to shareholders who prevailed in suit against the government for breach of supervisory merger contracts, as it would be improper to credit government as wrongdoer with profits that receivership was able to achieve, through no action of the government, in mitigation of damages caused by breach.

Don S. Willner, Don S. Willner & Associates, P.C., Trout Lake, Washington, with whom were Rosemary Stewart, Spriggs and Hollingsworth, Washington, D.C. and Thomas M. Buchanan, Winston & Strawn, Washington, D.C. for Plaintiffs.
Dorothy Ashley Doherty, Federal Deposit Insurance Corporation Legal Division, Washington, D.C., for FDIC-Receivership.
F. Jefferson Hughes, Trial Attorney, with whom were David M. Cohen, Director, Stuart E. Schiffer, Deputy Assistant Attorney General, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C. for Defendant. William F. Ryan, Assistant Director, and Tarek Sawi, Trial Attorney, of counsel.

*OPINION & ORDER*
SMITH, Senior Judge.

**I. Introduction**

Before the Court is Plaintiffs' second Motion for Reconsideration and Defendant's Motion for Reconsideration. In their motion, Plaintiffs request that the Court amend its damages award to include a 50-percent control premium, an adjustment for informational leakage, a gross up for taxes expected to be paid on the damages award, and a gross up for taxes incurred while in receivership. Defendant's motion, however, requests that the Court set aside or reduce its damages award for several reasons. For the reasons set forth below, Plaintiffs' motion is **GRANTED-in part and DENIED-in part**, and Defendant's motion is **DENIED**.

**II. Procedural Background**

This case is currently before the Court after trial and the entry of judgment in favor of Plaintiffs. In the Court's April 1, 2002, decision, the Court denied Plaintiffs' expectancy-damages claim for lost profits and their restitution claim. The Court determined, however, that Plaintiffs were nonetheless "entitled to recover the lost franchise value of the thrift ..." which the Court determined was equal to the market capitalization of Benjamin Franklin Federal Savings and Loan Association's ("Franklin") stock on the last business day prior to the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). *Suess v. United States,* 52 Fed.Cl. 221, 232 (2002). On June 6, 2002, the Court entered judgment in the amount of $34,672,500 in favor of Plaintiffs.

Shortly thereafter, both parties filed motions for reconsideration. After holding oral argument on November 21, 2002, the Court denied Plaintiffs' motion and withheld ruling on Defendant's motion until the receivership's income tax liability was determined. *Suess v. United States,* 54 Fed.Cl. 606, 607 (2002). The receivership's tax liability has since been resolved recently through a structured settlement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Fed.Cl. ----    Page 3
--- Fed.Cl. ----, 2006 WL 3703119 (Fed.Cl.), 98 A.F.T.R.2d 2006-8212
(Cite as: --- Fed.Cl. ----)

On May 24, 2006, Plaintiffs filed their second Motion for Reconsideration stating that "[t]he primary impetus for this motion is the Court's recent damages decision in *Slattery v. United States*, 69 Fed.Cl. 573 (2006) ...," wherein the Court awarded a 50-percent control premium, adjusted for informational leakage, and indicated the possibility of grossing up the damages award to compensate plaintiffs for taxes paid on the award. Pls.' Sec. Mot. at 1-2. Accordingly, Plaintiffs request that the Court amend its April 1, 2002, damages decision by: (1) adding a 50% control premium; (2) adjusting for informational leakage by measuring the thrift's market value on the day after former President Bush proposed FIRREA (February 24, 1989) rather than the day before FIRREA was enacted (August 8, 1989); (3) grossing up for taxes expected to be paid on the award; and (4) grossing up for taxes incurred while in receivership. *Id.*

### III. Discussion

### A. Legal Standard for Reconsideration

In their motions for reconsideration, Plaintiffs and Defendant request reconsideration of the Court's April 1, 2002, decision pursuant to Rules 52(b), 59(a)(1), and 60(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). Def.'s Mot. at 1; Pls.' Sec. Mot. at 2, n. 1 (quoting language from RCFC 60(b)(6)). The decision of whether to grant a motion for reconsideration rests within a court's sound discretion. *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990). Rules 52 and 59 allow a court to amend a judgment so long as the motion for reconsideration is filed within 10 days after the "judgment" is entered. RCFC 52(b), 59(b).

[1] Rule 60(b)(6) allows a court to amend a judgment "upon such terms as are just" and for "any other reason justifying relief from the operation of the judgment." To be timely, "the motion shall be made within a reasonable time." RCFC 60(b). Although Rule 60(b)(6) is the "catch-all" provision, it is only available in "extraordinary circumstances and only when the basis for relief does not fall within any of the other subsections of Rule 60(b)." *Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed.Cir.2002). As will be discussed below, to the extent the Court finds reconsideration appropriate under the circumstances presented, Rule 60(b)(6) is the proper vehicle. The Court now shifts its attention to the specific grounds of the parties' motions.

### B. Plaintiffs' Second Motion for Reconsideration

#### 1. Control Premium

[2] In Plaintiffs' second Motion for Reconsideration, Plaintiffs argue that the Court should add a 50-percent control premium to the damages award for the same reasons recognized by the Court in *Slattery*. Pls.' Sec. Mot. at 1. Defendant opposes Plaintiffs' request for a control premium based on the evidence presented. Def.'s Resp. at 10-13. In essence, Defendant asserts that Plaintiffs failed to offer evidence demonstrating that Franklin "would have commanded an acquisition per share equal to 1.5 times the market price of its stock." *Id.* at 10.

*Slattery*, like *Suess*, is a derivative action brought by shareholders of a failed financial institution (Meritor Savings Bank) seeking damages for the Government's breach of contract. In *Slattery*, Plaintiffs argued that control premiums are " 'almost always' paid in sales of a majority interest of a firm." *Slattery v. United States*, 69 Fed.Cl. 573, 584 (2006). To support this assertion, Slattery's expert witness, Dr. Finnerty, offered several persuasive reasons why control premiums are paid. *Id.* at 584-85 (stating that control premiums are paid for many reasons including: (1) synergy between firms; (2) belief that an acquirer can do better; (3) elimination of competition; and (4) market share). Dr. Finnerty offered evidence of comparable bank transactions in the 1988 time-frame where control premiums were paid. *Id.* at 585. Plaintiffs also offered evidence demonstrating that under-performing institutions command higher than average control premiums and further confirmed that firms with strong franchise values command higher control premiums. *Id.* at 584.

After finding that the *Slattery* plaintiffs were entitled to expectancy damages based on the market capitalization of Meritor, the Court awarded a 50-percent control premium. *Id.* at 585 (stating that "the Court finds that the control premium used by Dr. Finnerty justified"). In so doing, the Court rejected Defendant's argument "that control premiums are used only in an acquisition context." *Id.* at 584. The Court stated:

This seems illogical. A control premium is used in an acquisition because if one were to buy a company, one would then have control of the company. The stock price reflects only equity in a small portion of the company, but to value the whole company, it is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01227-EGS   Document 12-3   Filed 02/02/2007   Page 4 of 8

--- Fed.Cl. ----                                                                     Page 4
--- Fed.Cl. ----, 2006 WL 3703119 (Fed.Cl.), 98 A.F.T.R.2d 2006-8212
(Cite as: --- Fed.Cl. ----)

logical to price in the control premium, which would amount to its total value.

*Id.* at 585.

In the instant matter, Plaintiffs requested expectancy damages based on lost profits, but did not request damages based on the market capitalization of Franklin as the Plaintiffs in *Slattery* had done. *Suess v. United States*, 52 Fed.Cl. 221 (2002). In the context of their lost profits claim, Plaintiffs requested a control premium. *Id.* at 225. Plaintiffs reasoned that "[t]he market price of a single share of stock ... reflects its value to a passive investor. It does not include the value of the ability to control the firm...." Pls.' Mot. at 3. In an effort to justify the application of a premium for Franklin, Plaintiffs' expert witness, Dr. Rogowski, "analyzed other acquisitions which he deemed comparable to determine the premium which a buyer would be willing to pay ..." for Franklin. *Suess*, 52 Fed.Cl. at 225.

Ultimately, this Court denied the *Suess* Plaintiffs' lost profits claim finding that "defendant has raised sufficient doubts about the prospective health and profitability of Franklin as a going concern but for the breach that it would be inherently and improperly speculative to award lost profits to Franklin." *Id.* at 226. Although this Court awarded damages, *sua sponte*, based on the market capitalization of Franklin, this Court did not award a control premium in light of its belief that control premiums were inapplicable where the whole company was being valued.

Since the Court's ruling, however, more than four years have elapsed. During this time, the Court has had the opportunity to further consider this issue and refine its knowledge of control premiums. As a result, the Court's views have continued to evolve. Thus, in *Slattery*, this Court awarded a control premium based on its belief that the individual share price merely reflected partial ownership of a company. Where, however, the entire company is being valued, it is necessary to factor in the significant, inherent attribute that accompanies such ownership-control. In applying this evolved legal theory to the facts at issue, it is evident that the market capitalization of Franklin should include a control premium. Therefore, based on the evidence Plaintiffs offered and the context of this valuation, a 50-percent control premium is appropriate.

Plaintiffs filed their reconsideration motion under several rules. Considering the parameters of Rule 60(b)(6), the Court finds that rule to be the appropriate rule to govern as it was filed within a reasonable time after the *Slattery* decision was issued. Moreover, the extension of this Court's evolved legal theory to the *Suess* Plaintiffs serves the interests of justice, as it promotes the consistent application of the law. To find otherwise would cause two similar groups of plaintiffs to be treated very differently under the law-a result at odds with rendering justice. Therefore, in light of these "extraordinary circumstances," Plaintiffs' motion is GRANTED as to their request for a control premium.

### 2. Informational Leakage

[3] Plaintiffs also request that the Court account for informational "leakage" in determining Franklin's pre-breach value as it did in *Slattery.* Pls.' Sec. Mot. at 7-8. Defendant opposes Plaintiffs' request asserting that Plaintiffs failed to offer specific evidence of informational leakage. Def.'s Resp. at 14. Defendant further argues that to the extent Plaintiffs offered such evidence, they failed to demonstrate the negative impact of such information on Franklin's share price. *Id.*

In *Slattery,* plaintiffs argued that the Court should account for the negative impact certain articles had on Meritor's share price before the date of the actual breach. *Slattery v. United States,* 69 Fed.Cl. 573, 585 (2006). Slattery's expert witness, Dr. Finnerty, referred to the dissemination of such pre-breach information as "leakage," as it acted to effectively disclose information pertaining to the government's impending regulatory action prior to its actual occurrence. *Id.* The disclosure of this information caused Meritor's stock price to decline before the date of the actual breach, and the Plaintiffs in *Slattery* asserted that the Court can only determine Meritor's market capitalization by looking to its share price prior to the breach and before this information was available. *Id.* To further their case, Dr. Finnerty testified that Meritor stock had a close correlation with the NASDAQ Bank Index. *Id.* The Plaintiffs argued that the effect of such leakage is evidenced by the increase in the value of the Index as compared to the decrease in Meritor's share price. *Id.* And ultimately, this Court found Dr. Finnerty's reasoning to be sound in determining Meritor's pre-breach value. *Id.*

Although the *Suess* Plaintiffs *now* argue for the recognition of informational "leakage," Plaintiffs did not raise this theory in 2002. Rather, Plaintiffs argued

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-01227-EGS   Document 12-3   Filed 02/02/2007   Page 5 of 8

--- Fed.Cl. ----                                                                                                     Page 5
--- Fed.Cl. ----, 2006 WL 3703119 (Fed.Cl.), 98 A.F.T.R.2d 2006-8212
(Cite as: --- Fed.Cl. ----)

that the Government anticipatorily repudiated the contract on February 23, 1989, when former President Bush proposed FIRREA. *See* Pls.' Reply at 1 (stating that the introduction of FIRREA by President Bush "was an anticipatory breach, actual harm started, and it would be unfair to chose [sic] any later date for the accrual of damages"); *see also* Nov. 21, 2002 Tr. at 43-44. Since "the government treated FIRREA as if it was in effect long before it passed," Plaintiffs argued that the Court should measure Franklin's value as of February 24, 1989, the day after the FIRREA proposal and not the day before FIRREA was enacted-August 8, 1989. Pls.' Reply at 1; Pls.' Sec. Mot. at 3. Accordingly, and aside from arguing for an earlier date in valuing Franklin's stock, Plaintiffs' argument was distinct from the leakage argument in *Slattery.*

Even if the Court found that Plaintiffs' anticipatory repudiation theory sufficiently resembled the theory of leakage, Plaintiffs were still unable to substantiate their claim as was done by the *Slattery* plaintiffs. Rather than direct the Court's attention to specific examples of pre-breach informational leakage that had a measurable affect on Franklin's share price, Plaintiffs rely on generic, unsupported assertions. Specifically, Plaintiffs assert that former President Bush's proposal of FIRREA amounted to anticipatory repudiation. Plaintiffs also rely upon the unsupported statement of their expert, Dr. Horvitz that "I didn't know what FIRREA was going to include in 1988 before it was introduced. But everybody knew, the market clearly knew, that *something bad* was going to happen to the savings and loan industry." March 12, 1999 Tr. at 4351 (emphasis added). As a result, "stock prices were very depressed." *Id.* at 4352. Accordingly, it is evident that Plaintiffs failed to put forth sufficient factual evidence demonstrating that pre-breach information had been disseminated, that the market reacted to such information, and that it had a measurable effect on Franklin.

Therefore, Plaintiffs' request for the adjustment of the damages award to account for leakage is DENIED.

### 3. Tax Gross Up

#### i. A Gross Up for Taxes Expected to be Paid on the Damages Award

In their motion, Plaintiffs argue that because the Court indicated the possibility of grossing up the damages award in *Slattery* to avoid loss due to a tax assessment on the award, the Court should gross up their award. Pls.' Sec. Mot. at 8; Pls.' Post-Trial Br. at 16. In support, Plaintiffs assert that the Federal Circuit has affirmed a damages award that included such a gross up. *See id.* (citing *Home Sav. of Am., FSB v. United States,* 399 F.3d 1341, 1356 (Fed.Cir.2005)) (affirming the trial court, and holding that "[w]e adopt the rule of other courts that a tax gross up is appropriate when a taxable award compensates the plaintiff for lost monies that would not have been taxable") (citations omitted).

Defendant argues that a tax gross up is inappropriate here because it is unlikely that Plaintiffs will pay any taxes. Def.'s Resp. at 16-18. To support its assertion, Defendant advances two arguments. First, Defendant asserts that since Plaintiffs paid $38.25 million as interest in a structured settlement with the IRS, the receivership may be able to utilize this interest deduction to offset any income thereby reducing or eliminating its tax burden. *Id.* at 16. Second, Defendant asserts that since the damages award in this case is years away from being paid, and the receivership has no other source of income since it expects to distribute the entire balance of the award to the shareholders, there does not appear to be any need for a gross up. *Id.*

In response, Plaintiffs acknowledge that the receivership may not ultimately pay any taxes in light of the $38.25 million interest deduction. Pls.' Reply at 14. In light of this uncertainty, Plaintiffs assert that the Court can allow them to return, pursuant to RCFC 60(b)(6), for a tax gross up if the receivership ultimately pays taxes. *Id.* (stating that this proposition was recognized in *Bank of Am., FSB v. United States,* 67 Fed.Cl. 577, 596 (2005)).

In light of the Federal Circuit's ruling in *Home Savings of America, FSB,* a tax gross up is appropriate because the damages award compensates Plaintiffs for the market capitalization of Franklin-i.e., "lost monies that would not have been taxable." 399 F.3d at 1356. However, because the receivership's tax liability on the damages award is unknown at this time, it is appropriate for Plaintiffs to renew their Rule 60(b)(6) motion if the receivership ultimately pays taxes. The Court notes the illogical nature underlying a tax assessment in this context. If the Government assesses taxes on Plaintiffs' award, the Court will ultimately return the tax assessment amount to Plaintiffs in the form of a tax gross up. If logic and pure commonsense governed, it would make far greater sense for the Government to simply not tax Plaintiffs. This, however, is a matter outside

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the province of the Court.

Because a tax gross up is premature at this time, Plaintiffs' request for a tax gross up is, therefore, DENIED WITHOUT PREJUDICE.

### ii. A Gross Up for Taxes Incurred While in Receivership

[4] Plaintiffs' final request, is that the Court should increase their damages award to compensate them for the $50 million tax settlement paid by Franklin for taxes incurred while in receivership. Pls.' Sec. Mot. at 12-13; Pls.' Post-Trial Br. at 16. Plaintiffs assert that the receivership's tax liability resulted "primarily" due to the receipt of Federal Financial Assistance ("FFA") in 1990, which the IRS viewed as taxable "income." Pls.' Reply at 16. Plaintiffs argue that but for the breach, they would not have had to pay taxes on the FFA. *Id.* at 15. Because these taxes were incurred as a "direct consequence of the government's breach of contract," Plaintiffs request that the Court amend the damages award to compensate them for these costs. *Id.*

Defendant opposes such a gross up arguing that the low-interest rates accompanying the FFA "conferred a benefit in the amount of $140 million upon Franklin, which had the effect of moving the receivership from a deficit to a surplus." Def.'s Resp. at 20. Just as any profitable corporation must pay taxes, the receivership "must pay taxes upon the profits and earnings it has generated in growing the surplus." *Id.*

Under the facts of this case, the Court finds that the damage amount should not be grossed up for taxes incurred while in receivership. Plaintiffs' argument is flawed in that they argue that the receivership would not have had to pay taxes on the FFA but for the breach. Although that is true, Plaintiffs fail to appreciate that they would not have received the FFA at all had they not been placed in receivership. The FFA, rather than being viewed as a negative consequence of receivership, should be viewed as a positive attribute, as it conferred a significant benefit upon the receivership, thereby, allowing it to use the accompanying below-market rates to generate profits. The $50 million tax settlement is a reduction in the gain the receiver received from the FFA. Because the Court does not view the FFA as a loss to the receivership, but rather as a gain, the $50 million tax settlement cannot be treated as a compensable cost and, thus, will not be added to the damages award.

Plaintiffs' request for a tax gross up for taxes incurred while in receivership is, therefore, DENIED.

### C. Defendant's Motion for Reconsideration

Defendant filed its Motion for Reconsideration on June 20, 2002. The Court withheld ruling on Defendant's motion until after the receivership's tax liability was resolved. Recently, the parties informed the Court that they resolved the tax liability issue. As a result, the Court ordered the parties to file supplemental briefs addressing Defendant's 2002 motion. Accordingly, Defendant's motion is now ripe for the Court's review. Defendant's motion and supplemental brief center around three issues, each of which will be addressed separately.

### 1. The Court's Award Will Not be Offset by the Receivership Surplus

[5] Defendant asserts that the Court's damages award was premised on its belief that the surplus in the Franklin receivership would be lost due to massive tax claims. Def.'s Resp. to Pls.' Supp. Br. at 3-4. Upon this belief, the Court awarded Franklin its entire market capitalization value. *Id.* Plaintiffs now assert that there will be a $30 to $35 million surplus in the receivership after paying the tax settlement, therefore, Defendant requests that the Court set aside or reduce the judgment. *Id.* at 4.

Plaintiffs oppose the reduction of the damages award based on the remaining surplus. First, Plaintiffs argue that Franklin, and the now existing receivership, are distinct legal entities and, thus, the surplus should have no effect on the damages award. Pls.' Supp. Br. at 4-5. To make their case, Plaintiffs assert that the damages award was based on Franklin's value at the time of the breach. *Id.* at 4. The remaining surplus is due to the fact that the receiver's investments and debts were at rates that were favorable to the receivership estate. *Id.* at 7. In support of Plaintiffs' position, the FDIC asserts that Defendant's request for a reduction in the damages award based on the receivership surplus is "contrary to the law of the Circuit on mitigation of *Winstar* damages and should be rejected." FDIC's Reply to Def.'s Resp. at 2 (citing *LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363 (Fed.Cir.2003)).

At the time of this Court's decision, it was indeed operating under the belief that the receivership faced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a tax assessment in the amount of $741.8 million. *Suess v. United States,* 52 Fed.Cl. 221, 231 (2002) (stating that "[t]he problem, however, is that the receivership faces a tax claim relating to alleged federal financial assistance received by Franklin that dwarfs the receivership surplus"). While the Court believed that the receivership value would be a negative number and thus valueless, when the Court rendered its initial damages decision this collateral value did not effect the government's liability for the breach. The breach fundamentally changed and ended the existence of Franklin, turning it from a functioning and living institution into a receivership. For a long time, this receivership appeared to have a zero value. Two things recently changed this. First, through the efforts of the Plaintiff-shareholders and the FDIC Receiver Plaintiff, the IRS debt was settled for a small fraction of its initial claim. Second, through the efforts of the FDIC Receiver Plaintiff, the receivership made money building on the base the Franklin management had developed over the years. Neither of these two events was related to the Defendant's actions. Thus, as the Federal Circuit noted in *LaSalle,* "it is improper to credit the wrongdoer with the profits that the non-breaching party was able to achieve, through no action by the wrongdoer, in mitigating the damages caused by the breach," *LaSalle,* 317 F.3d at 1371. This is particularly poignant here where justice would require the compensation of the injured for the time value of the money they have lost. Since sovereign immunity has not been waived for this very real element of damage this Court must under its oath to follow the law deny any claim for this just amount due.

For these reasons, Defendant's Motion for Reconsideration on this issue is DENIED.

### 2. The Court's Causation Findings are Consistent with Existing Authority

Defendant argues that the Court's causation findings are inconsistent with the Federal Circuit's recent ruling in *California Federal Bank v. United States,* 395 F.3d 1263, 1267-68 (Fed.Cir.2005). Def.'s Resp. to Pls.' Supp. Br. at 12-13. Specifically, Defendant asserts that since the Court used the "substantial factor" test, and the Federal Circuit rejected this test, the Court's findings are flawed. *Id.* at 2.

In light of Defendant's assertions, the Court must examine the *California Federal* ruling. Defendant relies heavily on one particular passage from the case wherein the court stated:

The passage from the *Bluebonnet* case on which CalFed relies does not state or imply that the causation requirement is satisfied any time the breach is a 'substantial factor' in causing the claimed lost profits. The court in *Bluebonnet* noted that the trial court had found that the breach 'was a substantial factor in Bluebonnet's increased financing costs,' reflecting the way the trial court characterized its finding. Importantly, however, the court upheld the trial court's ruling on causation only after concluding that "[t]he government's various arguments regarding alternative causes for the damages lack merit." That statement is consistent with the standard applied by this court and our predecessor court in numerous cases, including the previous appeal in this case, *that the causal connection between the breach and the loss of profits must be "definitely established."* Th[is] standard ... ensures that the non-breaching party will not be awarded more than it would have received if the contract had been performed. Thus, the Court of Federal Claims correctly rejected *the "substantial factor" test* advocated by CalFed. *That is not to say that the breach must be the sole factor or sole cause in the loss of profits. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach.*

*Cal. Fed.,* 395 F.3d at 1267-68 (Emphases added).

Although it is evident that the Federal Circuit rejected a court's sole reliance on the substantial factor test as advocated by plaintiffs in *California Federal,* the Court's reasoning demonstrates that it does not put form over substance. Rather, the Federal Circuit closely examines the reasoning underlying the lower court's holding. Specifically, the Court stated that where the causal connection between the breach and the damages suffered is "definitely established," the causation prong is satisfied. *Id.* at 1268. The court, however, further explained that the breach need not be the "sole factor or sole cause" of the damages. *Id.* Rather, the "existence of other factors operating in confluence with the breach will not necessarily preclude recovery...." *Id.* Moreover, the Federal Circuit recognized that the *Bluebonnet* court upheld the trial court's use of the "substantial factor" test after determining that the trial court had determined that the other possible causes of the damages lacked merit. *Id.* at 1267. Thus, and despite Defendant's argument to the contrary, it is evident that the Federal Circuit does not limit its review solely to the use of certain terms, but rather focuses on the basis for the lower court's findings.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court, however, is satisfied that its causation analysis satisfies the *California Federal* standard. As pointed out by Defendant, in *Suess* this Court ultimately found that "the breaching provisions of FIRREA were the 'substantial factor' leading to the demise of Franklin, and sufficient to establish the causation element of damages based on the lost value of the Franklin franchise." *Suess,* 52 Fed.Cl. at 231 (citing *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1356 (Fed.Cir.2001)). However, before reaching this conclusion, this Court determined that the causal connection between the breach and the damages suffered was "definitely established." *Cal. Fed.,* 395 F.3d at 1268. Although not couched in those specific terms, it was found that the evidence demonstrated that "the breach rendered Franklin massively insolvent and in immediate distress, which *would not have been the case* had the goodwill been recognized." *Suess,* 52 Fed.Cl. at 230 (emphasis added). In awarding damages, it was recognized that "but for the breach, Franklin would have been a going concern with a market value of $35 million. Because of the breach, its equity value is now effectively zero." *Id.* at 231.

In further agreement with the *California Federal* ruling, a thorough examination of Defendant's possible alternative causes for the damages was conducted and it was determined that although they certainly did not represent positive factors for Franklin, they were not the cause of Franklin's demise. *See id.* (finding that Plaintiffs had offered "ample evidence" demonstrating that the "capital problems" cited by Defendant, "could have been managed had Franklin had the capital cushion that goodwill provided").

For these reasons, Defendant's Motion for Reconsideration is DENIED as to this issue.

### 3. The Market Capitalization Theory of Damages is Appropriate

Lastly, Defendant argues that the Court's use of the market capitalization theory is flawed. Def.'s Resp. to Pls.' Supp. Br. at 10. Rather, Defendant asserts that the Court should have used Franklin's earnings to project the value of the corporation. *Id.* Defendant also contends that the theory used by the Court does not take into account "hidden" information regarding undisclosed losses that may have existed. *See id.* at 12, n. 5; *see also* August 23, 2006 Tr.

Despite Defendant's assertion, it is clear to the Court that the share price of Franklin's stock represents the clearest indicator of Franklin's value prior to the Government's breach. As recognized by the Court, "[t]his amount establishes how the market valued future income of Franklin discounted to present value, and it presumably incorporates the value the market assigned to goodwill, which remained on Franklin's books at the time of the breach." *Suess,* 52 Fed.Cl. at 231. The earnings model is far less reliable than the efficient market model. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 244, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (recognizing the use of the market model). Whereas an earnings model requires the Court to make projections based on past performance, the market capitalization model utilizes the value that potential buyers are actually willing to pay for the company on the market. Moreover, Defendant's attempt to discredit the value of this theory based solely on the possibility of some "hidden" information, which makes up only one small part of a complicated equation, is inappropriate and is similar to valuing an individual by looking solely at the debt owed on their 30-year mortgage note without considering other counterbalancing factors such as the possibility for increased earnings over that same period of time.

For these reasons, Defendant's Motion for Reconsideration on this issue is DENIED.

### IV. Conclusion

Accordingly, Plaintiffs' second Motion for Reconsideration is GRANTED-in part and DENIED-in part. Defendant's Motion for Reconsideration is DENIED. In accordance with the holdings above, the Court's June 6, 2002, judgment is amended to include a 50-percent control premium which increases the award to $52,008,750. This award shall not be offset with the receivership surplus. In the event Plaintiffs ultimately pay taxes on the damages award, Plaintiffs may file a motion under Rule 60(b)(6) requesting a tax gross up.

**It is so ORDERED.**

Fed.Cl.,2006.
Suess v. U.S.
--- Fed.Cl. ----, 2006 WL 3703119 (Fed.Cl.), 98 A.F.T.R.2d 2006-8212

Briefs and Other Related Documents (Back to top)

• 1:90cv00981 (Docket) (Sep. 14, 1990)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.