AAGILL.txt

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x
WINSTON & STRAWN, LLP, et al., :
         Plaintiffs,           :
                               :
    v.                         : No. 06-01120 (EGS)
                               :     06-01227 (EGS)
FEDERAL DEPOSIT INSURANCE      :     06-01273 (EGS)
CORPORATION,                   :
                               :
         Defendant.            :
------------------------------x

Washington, D.C.

Wednesday, January 17, 2007

Deposition of

RICHARD GILL

a witness, called for examination by counsel for Plaintiffs, pursuant to notice and agreement of counsel, beginning at approximately 2:30 p.m., at the law offices of Winston & Strawn, 1700 K Street, NW., Washington, D.C., before Mary Ann Payonk of Beta Court Reporting, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

2

1    APPEARANCES:

2       On behalf of Winston & Strawn, LLP:

Page 1

AAGILL.txt
18  whatever you want to call it, I've probably
19  handled hundreds.
20      Q    But just so we're clear, the only
21  other fee petitions you evaluated have been
22  those of contract attorneys who were doing

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

9

1   work for FDIC, is that correct?
2       A    That is correct.
3       Q    Does FDIC have any written or oral
4   guidelines for evaluation of attorney fee
5   petitions?
6       A    I am not aware of any.
7       Q    So we're clear, and no such
8   guidelines were utilized by you in reviewing
9   my fee petition?
10      A    No, I did not look at any -- any
11  FDIC policy on this matter.
12      Q    Were you given any oral
13  instructions by anyone in terms of how to
14  evaluate my fee petition?
15      A    Can -- that -- I'd have to say yes.
16      Q    All right.
17      A    I mean, but it -- as far as --
18      Q    Who gave you those instructions,
19  and what were they?
20      A    Robert Clark and Rick Aboussie.

Page 8

AAGILL.txt

21      Q    And what instructions were you
22  given in evaluating my fee petition?

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

10

1            MR. TAYLOR:  Let me stop the
2   witness here for a second.
3            MR. WILLNER:  Sure.
4            MR. TAYLOR:  I'm going to object
5   initially insofar as it calls for information
6   that's protected by the work product
7   privilege and instruct the witness not to
8   answer if it does.  Otherwise, if your
9   question calls for whether he was provided
10  with the standards of review, that's fine.
11           BY MR. WILLNER:
12      Q    Were you provided standards of
13  review by any superior in connection with my
14  fee petition?
15      A    No.
16      Q    All right.  Do not answer this
17  question, to give your attorney a chance to
18  object.  Were you provided any guidance in
19  writing or orally by any of your superiors in
20  dealing with my fee petition?
21           MR. TAYLOR:  Again, to the extent
22  it calls for information that's protected by

AAGILL.txt

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

11

```
 1    the work product provision I object and I
 2    instruct the witness not to answer.  If it's
 3    just talking about policies, procedures,
 4    specific instructions about how to go about
 5    it, that's fine.
 6            MR. WILLNER:  I think you're
 7    premature.  I just asked him if he provided
 8    any.
 9       A    The answer is yes, but it's in
10    response to your November 2004 letter
11    agreement that you had with the FDIC.
12            BY MR. WILLNER:
13       Q    All right.  Well, what
14    instructions, guidelines, were you given in
15    connection with the letter agreement between
16    Bob Clark and myself?
17       A    The November agreement, the letter
18    agreement which Bob Clark memorialized with I
19    believe a one-sentence concurrence, says that
20    the FDIC will support reasonable attorneys'
21    fees and that the -- and that the fees, you
22    know, will be run through the receivership
```

AAGILL.txt

63

1  get nothing. So my internal calculus was
2  that this was a case that was crying out for
3  settlement, so I firmly believe trial would
4  not have been good for this case.
5      Q    Did you share with that anyone,
6  that you thought settlement would be the
7  preferred avenue?
8      A    I believe I shared it with Don and
9  Tom Buchanan. I can't remember. I'm not
10  sure whether I shared it with Ernie or not,
11  but at that time, I thought Ernie was a
12  consultant to Don.
13      Q    Did you share that view with the
14  Court at any point?
15      A    No, because the -- the -- well,
16  yes, in the sense -- and not directly. What
17  we had to file every six months was status --
18  status updates or status updates on the case.
19  And, you know, what we -- each status
20  conference we'd file is we're making progress
21  towards settlement. So I didn't say that,
22  you know, we wanted -- we didn't want to

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

64

AAGILL.txt

1  litigate, but certainly, you know, if you
2  read the status conference reports, it
3  certainly -- and then I think Judge Sullivan
4  mentioned that in the fairness hearing that
5  each status report, he could tell that we
6  were making progress towards settlement.
7      Q    Earlier you referenced the money,
8  that the IRS either way felt that they were
9  going to get the money. When you refer to
10 the money, is that the -- the balance of the
11 surplus in the receivership?
12     A    Yes. It was the surplus that
13 turned out to be around $94 million.
14     Q    So their general feeling was that
15 no matter how things ran, they were going to
16 end up getting the balance of the surplus?
17     A    Yes. When they sued for a
18 million-2 or a billion 2, they felt that, you
19 know, no matter, it just would be gradations,
20 but no matter which scenario was run, it
21 would never push it down to a level where
22 you'd generate a surplus.

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

65

1      Q    Uh-huh. Now, you referred to 11 or
2  12 scenarios that were to be run. Do you

Page 59

```
                          AAGILL.txt
 3    know who authored those?  Was that the IRS?
 4         A    I believe, yes, yes, it was Susan
 5    -- was it Susan?  It was -- it was -- and
 6    this was before my time on the case, but the
 7    -- the attorney for the DOJ, Henry
 8    Darnstadter, D-A-R-N-S-T-A-D-T-E-R, but he
 9    stated to me that somebody had suggested
10    that, and he went along with it.  And I guess
11    through discussions -- and I wasn't there --
12    they basically ran the tax scenarios
13    depending on a number of assumptions which
14    way federal financial assistance was taxed,
15    and there were a bunch of other assumptions
16    that kind of escaped me, whether penalties
17    were excluded.  And I think they produced 11
18    scenarios, and I believe two of which
19    produced actually a surplus.
20         Q    Do you happen to recall the amounts
21    of surpluses those two scenarios resulted in?
22    Approximate amount is fine.


                    BETA COURT REPORTING
                    www.betareporting.com
              (202) 464-2400    800-522-2382
```

```
                                                        66

 1         A    I think -- I think that -- and the
 2    documents will probably prove how accurate,
 3    but one produced a tax liability of around 12
 4    and a half million, which we believe I think
 5    was scenario 10, which we believe was the --
                         Page 60
```

AAGILL.txt

11   A   I tried to.  I mean, I -- it was
12   tedious, but I went through them.
13   Q   What are some of the factors that
14   you used in evaluating granting Winston &
15   Strawn the standard hourly billing rate?
16   A   I accepted -- I looked to see that
17   the work that was done was legal and related
18   to the tax case.  And I accepted your
19   representations about your hourly rates,
20   which, you know, as law firms do, they
21   increased over time.  And so that -- that's
22   -- and I guess, you know, maybe it's

69

1   answering your question indirectly, but I
2   think it was 15.5 hours that I disallowed.  I
3   believed that those hours were spent -- you
4   know, in a big bill like that it's not
5   surprising those hours were spent on the
6   goodwill case, the related but unrelated
7   case.  So I thought that wasn't directly
8   related to the tax case.
9   Q   In evaluating Winston & Strawn's
10  claim for a success fee, which factors did
11  you use to evaluate that part of the proof of
12  claim?

Page 63

AAGILL.txt

13    A    Well, I guess -- backing up, I -- I
14  think we were not going to pay a success fee.
15  In other words, our understanding -- and
16  maybe Tom Buchanan and Winston got pulled in
17  -- is that according to our letter with Don
18  Willner, we believed that reasonable hourly
19  rates was the standard rate.  And I know that
20  Tom wasn't, you know, directly involved in
21  that letter, but I think the FDIC's feeling
22  was what was good for the goose is good for

70

1   the gander and that we were going to pay the
2   standard hourly rates.
3              (Discussion off the record.)
4         BY MR. PLUTA:
5    Q    How familiar are you with the
6   involvement of various firms working on the
7   tax issue?  And by that I mean the amount of
8   work done by the various firms, the presence
9   of the various firms, the lawyers involved,
10  the resources allocated.
11   A    I mean, reasonably familiar, but I
12  don't want to say intimately familiar.  I
13  mean, I -- I learned a lot, I think, by
14  reviewing the bills, but --
15   Q    Okay.  And based on your

Page 64

AAGILL.txt

16    familiarity and reviewing the bills, I think
17    you used the term earlier "heavy lifting."
18    In your opinion, of the law firms that worked
19    on the tax settlement, who in your opinion or
20    what firm in your opinion did the most heavy
21    lifting?
22         A    I think with respect to the tax

71

1    matters, the -- I think Winston & Strawn --
2    at least there was a memo written on the
3    federal financial assistance that -- that I
4    thought was very helpful in, you know,
5    advancing certain of the issues in the tax
6    settlement.  I mean, that -- that's what I
7    remember in particular.
8         Q    Was there anything else besides the
9    memo?
10        A    Well, in -- I -- I thought that
11   Mitchell Moetel, which I don't remember how
12   -- of the Winston & Strawn firm did, you
13   know, very effective jobs at the settlement
14   conference on advancing, you know, certain of
15   the tax positions.
16        Q    Are you familiar with the various
17   tasks that were performed by the different

```
                        AAGILL.txt
18    law firms in regards to the IRS settlement
19    issue?
20        A    In general.  I -- I don't want to
21    say that I -- I -- I mean, it was more by
22    watching the people at the settlement that I
```
BETA COURT REPORTING
www.betareporting.com
(202) 464-2400     800-522-2382

                                                72

```
1     was gleaning what tasks were allocated, but I
2     truthfully don't think I knew in advance --
3     and maybe my perceptions were wrong -- as to
4     who was doing what.
5         Q    Okay.  Given that, given your
6     perceptions, do you have knowledge of which
7     firm, in your opinion, reviewed the majority
8     of the tax returns?
9         A    Judging by the billing, it was
10    clear that the Winston & Strawn firm reviewed
11    most of the tax firms -- I mean, the tax
12    forms.  Certainly, Ernie Fleischer's firm did
13    some work, but it looked like in particular
14    Mitchell Moetel was assigned because there
15    were lots of hours reviewing the various tax
16    returns and -- and tax matters.
17        Q    Which firm performed the most legal
18    analysis and research?
19        A    Just given -- given what -- given
20    what I saw, I'd say that on the -- that --
```

AAGILL.txt

21  that the Mitch -- Winston & Strawn performed
22  at least a significant part of the legal

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

73

1   research.  And I think Rosemary Stewart
2   provided some.  But I don't think that was --
3   I think that was not necessarily the tax
4   strategy.  And I -- Ernie, I would assume,
5   provided some, but I just don't remember.
6        Q    Which law firm did the -- the most
7   work associated with the presentations that
8   were given?
9        A    As far as the substantive
10  responses, I would say Winston & Strawn.  I
11  think, you know, Don Willner considers
12  himself the master of ceremonies and the
13  maestro, but I think the heavy substantive
14  work, at least as far as the -- was done by
15  Winston & Strawn.  And I remember Ernie did
16  some work on a -- on a goodwill issue that --
17  but I think that the main substantive work
18  was Winston & Strawn.
19       Q    Can you tell me which firm did the
20  majority of the substantive work in the
21  negotiations with the IRS directly?
22       A    You know, that -- in other words,

AAGILL.txt

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

74

1   the negotiation was a combination of the FDIC
2   and the law firms and the IRS.  I mean,
3   certainly -- trying to remember.  I know that
4   Winston & Strawn did a lot of the
5   substantive, you know, presentations at the
6   negotiations.  I think there was a lot of --
7   lot -- I would say at the actual settlement
8   discussions where the -- the IRS and all the
9   people were present, the Winston & Strawn
10  firm -- subsequently, there were a lot of
11  like telephonic conversations.  So I think
12  Don Willner played a part, I played a part
13  and --
14       Q    Okay.  In your opinion, if you
15  could single out one single attorney who did
16  the most to bring about a successful
17  settlement of the IRS claim, who would that
18  be?
19       A    Excluding me?
20       Q    Excluding -- excluding you.
21       A    You know, that -- in all honesty,
22  it's hard to answer that question because I

1    think the combined group performed the magic
2    of the settlement.  I mean, I -- certainly, I
3    mean, if -- you know, issue by issue, I think
4    Mitchell Moetel did -- well, I think Mike
5    Duhl, who was an FDIC consultant, and Richard
6    Peyster, who was at FDIC, had discussions
7    with IRS on the way FFA should be taxed.
8    Mitchell Moetel did a memo that was very
9    useful and I think very helpful in
10   facilitating settlement.
11              But there were a bunch of other tax
12   issues that I think lots -- I mean, it wasn't
13   -- my predecessors, Hugo and Catherine, there
14   was a big issue that would have pulled away
15   all the surplus.  There was approximately 260
16   million of the subrogated interests that the
17   FDIC wanted to deduct in 1990, and the IRS
18   said that it didn't meet the all events test
19   because it was accrued later and paid later.
20   The FDIC, my predecessors, carried the ball
21   on that.
22              So I don't mean not to answer the

AAGILL.txt

12   hour. And I assumed that that was the rate
13   that -- that Winston & Strawn was getting.
14       Q    Did you understand that rate to be
15   a discount to what Winston & Strawn typically
16   charges for legal services?
17       A    Yes, and that -- that's why we felt
18   like, you know, the standard hourly rate was
19   appropriate because it was significantly
20   more. I mean, I think Tom Buchanan's rate
21   when we left the case was like 505 an hour.
22   It's probably higher now, but --

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

82

1        Q    In your assessment of the situation
2    do you believe that Winston & Strawn assumed
3    a measure of risk in prosecuting the
4    shareholders' case?
5        A    Now that requires facts that I'm
6    not fully aware of. I don't know what
7    Winston & Strawn's total wall was, but -- but
8    certainly if a firm takes a case on
9    contingency, you obviously do assume some
10   risk. I guess the -- to mitigate that risk a
11   little bit, you at least were getting paid
12   something. It wasn't a pure contingency, but
13   -- but there obviously is risk when you take

Page 75

AAGILL.txt

14  on a case if you're not being compensated
15  straight up at your normal hourly rate.
16      Q    If Winston & Strawn -- strike that.
17  If the case had been lost, would the FDIC
18  have approved Winston & Strawn's standard
19  billing rates?
20      A    Oh, absolutely not, because I think
21  in the letter to Don Willner it was made
22  clear that this was contingent on the

0

83

1   successful settlement.
2       Q    So if Winston & Strawn would not be
3   compensated if the case was lost, if the case
4   was won, they would merely be compensated to
5   the level of their standard billing rates?
6       A    Well, that's a question I don't
7   know the answer to is if this case had
8   actually been litigated to judgment.  And,
9   one, I think the FDIC wouldn't be directly
10  involved in it.  You would be going to the
11  Court to get, you know, some type of -- but
12  this was part of a -- of a settlement
13  process.  And the specific deal was if the
14  settlement was effectuated, the attorneys
15  that, you know, added to the settlement would
16  be compensated.

Page 76

AAGILL.txt

17    Q    In the discussions you had
18    regarding the awarding or not to award the
19    success fee to Winston & Strawn, do you
20    recall any legal basis that was discussed or
21    that you relied on to deny the success fee?
22    A    We -- we believed that it was -- it

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400    800-522-2382

84

1    was based -- I mean, it wasn't as much a
2    legal basis as what the -- the letter
3    agreement said.
4    Q    So the letter agreement was both a
5    factual and a legal basis to deny the awards?
6    A    Well, it was clearly the factual
7    basis. I don't think we ever -- I don't
8    think we ever got into -- I mean, we
9    certainly -- we certainly looked at the cases
10   and, you know, we didn't believe that -- I
11   mean, obviously, you're having a de novo
12   proceeding in district court. And Judge
13   Sullivan will be the final arbiter, but just
14   on our read of the cases, if one law firm had
15   taken on a case and provided through trial
16   and successfully run it, then a success fee
17   in many cases was appropriate.
18         This was a novel animal. It was

AAGILL.txt
19  effectuating a settlement, and so I think the
20  primary basis was the fact that the FDIC
21  believed it had -- its position was we were
22  going to pay the normal hourly rates.


BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382


                                            85

1       Q    Do you happen to know if Winston &
2   Strawn was a party to the agreement that you
3   refer to?
4       A    No.  Winston & Strawn wasn't at
5   that time.  Should I say it diplomatically?
6   I think Bob Seuss, who was Winston & Strawn
7   client, and Don Willner, was on the outs, so
8   to speak.  So Winston & Strawn was not a
9   direct party to that agreement.
10      Q    Do you know if that letter or
11  agreement were referenced in any way in the
12  disallowance letter you sent Winston & Strawn
13  regarding that claim?
14      A    I don't think it was.  I don't
15  think it was.
16      Q    Did you cite any or rely on any
17  case law in deciding whether or not to grant
18  a success fee?
19      A    Not in the disallowance letter, no.
20      Q    When you were going through the
21  process of deciding whether or not to grant