# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WINSTON & STRAWN LLP, <br><br> and <br><br> WILLNER & ASSOCIATES, <br><br> and <br><br> BLACKWELL SANDERS PEPER MARTIN <br> and <br> ERNEST M. FLEISCHER, <br><br> Consolidated Plaintiffs, <br><br> v. <br><br> FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR THE BENJ. FRANKLIN FS&LA, <br><br> Defendant. | Civil Case No. 06-1120 (EGS) <br><br> [Consolidated with No. 06-1227 (EGS) and No. 06-1273 (EGS)] |

## DECLARATION OF MICHAEL C. MOETELL

I, Michael C. Moetell, certify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I have been a partner with Winston & Strawn LLP since February 2002.

2. During 2002, I was asked by my partner, Tom Buchanan, to assist in a tax matter arising out of the receivership of the Benj. Franklin Federal Savings and Loan ("Benj. Franklin"). Winston & Strawn represented a number of shareholders of Benj. Franklin. At that time, the receivership had a net surplus of approximately $90 million. In addition, the shareholders had obtained a $35 million judgment in a lawsuit against the United States in the U.S. Court of Federal Claims, and planned to file motions seeking additional damages. However, the United States had asserted a claim against the receivership for federal income taxes, interest and penalties in an amount exceeding $1 billion. Such a

claim well-exceeded the receivership surplus and any foreseeable future recoveries by the shareholders on behalf of the receivership, so that no funds would be available for distribution to shareholders. In 2002, the United States brought suit against the FDIC, as receiver of Benj. Franklin, in federal district court to transform this claim into a judgment.

3. The United States' tax claim primarily arose out of events taking place in 1990, the year that Benj. Franklin was placed into receivership. During that year, the FDIC's predecessor, the Resolution Trust Corporation ("RTC"), advanced roughly $2 billion to the receivership, all of which was repaid by the receivership, together with $258 million in interest, over the next several years. The Internal Revenue Service ("IRS") took the position that the amounts advanced should be treated as taxable income to the receivership, with deductions being allowed for the same amounts in the years they were repaid. Under this approach, the deductions allowed in later years generally could be carried back to offset the income attributed by the IRS to the receivership for 1990. Nevertheless, this approach resulted in an immense liability for taxes and interest, because under the tax laws and regulations then in effect (1) the carryback of deductions could not entirely eliminate the receivership's liability for alternative minimum tax, and (2) the receivership would have owed several years' worth of interest to the IRS calculated on the much larger amount of taxes that would have been due had no carryback of deductions been available.

4. My role was to evaluate the government's tax claim and, together with the other shareholder representatives, seek to reduce or eliminate the claim through litigation or settlement negotiations.

5. This task was made more difficult by the facts that (1) the RTC had filed receivership tax returns late, thereby allowing the IRS to assert "failure to file" penalties, and interest on such penalties, in excess of $500 million; (2) the FDIC had retained copies of the receivership tax returns but indicated to us they were not able to locate many of the underlying records that would have been useful in rebutting the IRS's positions or supporting alternative positions; (3) the RTC failed to claim on the receivership's tax returns the $258 million of interest deductions to which the receivership was entitled; and (4) the RTC failed to claim other significant tax benefits to which the receivership was entitled. The settlement of the receivership's tax liabilities that was ultimately agreed did not include any amount attributable to tax penalties, but in my judgment the IRS's ability to assert these penalties significantly enhanced its bargaining power.

6. During the period from 2002 through 2004, I participated extensively in negotiations with representatives of the IRS, the Tax Division of the Department of Justice ("DOJ"), and the FDIC regarding the Benj. Franklin receivership's proper liability for taxes, penalties and interest. These negotiations, and the settlement that was ultimately reached, addressed the receivership's liabilities for the tax years 1990 through 2002.

7. During these negotiations, FDIC representatives indicated to us on more than one occasion that they viewed themselves as "stakeholders" and that they did not believe they owed a fiduciary duty to the shareholders to preserve the surplus. It was therefore

apparent to me that the representatives of the Benj. Franklin shareholders would have to do the work necessary to reduce or eliminate the IRS claim so that receivership funds would be available to the shareholders.

8. I played a primary role in researching and analyzing the position that the advances by the RTC to the Benj. Franklin receivership could not properly be treated as taxable income, but instead had to be treated as loans. If this position were adopted, and the receivership were permitted to deduct the $258 million of interest as it accrued, the liability of the receivership for taxes, interest and penalties would have been roughly $33 million, rather than the greater than $1 billion amount asserted by the IRS. Other corrections that we proposed to make to the RTC's and IRS's tax calculations would have resulted in further substantial reductions to this amount. I drafted a position paper setting out at length the legal basis for this position and argued its merits in several meetings and telephone discussions with IRS and DOJ representatives. *See* Ex. A.

9. Through discussions with the FDIC in late 2002 and early 2003, I learned that the FDIC had proposed to DOJ that the receivership's tax liabilities should be settled by (1) taxing the RTC advances as proposed by the IRS but (2) allowing the receivership to claim deductions for the $258 million of interest as it accrued. The FDIC erroneously believed that this scenario would lead to a total tax and interest liability of approximately $38 million for the period from 1990 through 2002. In fact, for the reasons set forth in paragraph 3 above relating to alternative minimum tax and interest on taxes, the FDIC's proposal would have resulted in a liability of several hundred million dollars and would have completely depleted the receivership surplus. At a meeting with the FDIC on April 9, 2003, I explained these consequences to the FDIC and persuaded them to abandon that proposal.

10. At that same April 9, 2003 meeting, Catherine Topping, the lead FDIC lawyer handling the matter at that time, stated that the prospect that the shareholder representatives would intervene in the tax case brought by the United States against the FDIC was the reason why the IRS and DOJ were willing to negotiate a settlement of the tax case, as opposed to simply proceeding with their efforts to obtain a judgment in federal district court against the receivership.

11. On December 16, 2003, the DOJ produced, as a basis for discussion, calculations of the taxes (but not penalties and interest) that would be due from the receivership for the years 1990 through 2002 under 11 different scenarios. *See* Ex. B. On March 29, 2004, the DOJ produced another set of calculations, this time covering taxes, penalties and interest, for each of 12 different scenarios. *See* Ex. C. The taxes, penalties and interest due under these scenarios ranged from an amount in excess of $800 million to roughly $33 million (in the scenario that adopted our position that the RTC advances should be treated as loans). Excluding penalties and interest on penalties, the taxes and interest due under these scenarios ranged from roughly $450 million to roughly $33 million (again, in the scenario that adopted our position that the RTC advances should be treated as loans).

12. The scenarios included in DOJ's calculations were not necessarily endorsed by either party, nor were they necessarily outcomes that could have been reached if the matter

were litigated to a conclusion. For example, the scenario referred to as "Schedule 10" identified the results that would be obtained if certain regulations under section 597 of the Internal Revenue Code, adopted in December 1995, could have been retroactively applied to 1990. Although taxpayers could elect to apply the regulations retroactively in specified circumstances, at the time the regulations were issued it was already too late for the RTC to make the election to apply the regulations to the 1990 tax year. The FDIC acknowledged as much in a July 30, 2003 letter to DOJ. *See* Ex. D. Accordingly, "Schedule 10" was not a result that could be reached as a matter of law. Rather, it was merely a means of providing a rationale for a possible compromise figure.

13. Henry Darmstadter, the lead DOJ tax lawyer in this matter, told me during this time period that his client (the IRS) was strongly of the view that neither Schedule 10 nor the shareholders' position was correct and that the correct liability of the receivership for tax and interest should be much higher.

14. Several of the scenarios, including Schedule 10 and the scenario advocated by the shareholders, contemplated that the Benj. Franklin receivership would be entitled to deduct on an accrual basis the $258 million of interest paid to RTC on its advances that was not deducted on the original returns filed by the RTC. The IRS and the Department of Justice resisted this approach, arguing that the interest was deductible, but only in the years in which it was paid. DOJ asked the FDIC and the shareholders to present their views on this issue. The FDIC presented its view that this deduction was appropriate in a March 17, 2004 letter to DOJ. Ex. E. On behalf of the shareholders, I prepared a position paper on the interest deduction issue, agreeing with the FDIC's position and providing additional analysis not contained in the FDIC letter. That position paper was submitted to DOJ, with a copy to the FDIC, on April 14, 2004. Ex. F.

15. In my view, the legal arguments in support of our position that the RTC advances to the Benj. Franklin receivership should have been treated as loans were, and are, compelling. I believe the prospect that the Benj. Franklin shareholders would intervene in the pending tax litigation, argue for the position that the RTC advances should be treated as loans, and possibly prevail was the primary reason why IRS and Department of Justice ultimately settled the case for an amount of taxes and interest that exceeded our position by several million dollars but fell hundreds of millions of dollars short of the position originally advocated by the IRS.

16. The liability of the receivership for taxes and interest for the period 1990 through 2002 was ultimately settled for $50 million, which the parties further agreed to treat as being composed 25% of tax and 75% of interest. Based on my discussions with Mr. Darmstadter, I believe this number reflected the parties' relative bargaining positions and their assessments of all of the litigation risks in the case. The $50 million figure did not correspond to any of the scenarios that had previously been circulated by DOJ. The $50 million figure exceeded the taxes and interest that would have been payable under Schedule 10 by several million dollars.

17. I did not have a role in the Goodwill Case before the Court of Federal Claims.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York
March 14, 2007

By: _____
Michael C. Moetell

DC:493654.4