# DON S. WILLNER & ASSOCIATES, PC

Don S. Willner

(Licensed in Oregon and Washington)

OREGON OFFICE
Suite 1415 The American Bank Building
621 S.W. Morrison Street
Portland, OR 97205
Telephone: (503) 228-4000
Fax: (503) 273-8842
donswillner@aol.com

WASHINGTON OFFICE
630 Sunnyside Road
Trout Lake, WA 98650
Phone: 509-395-2000
Fax: 509-395-2939
donswillner@aol.com

April 14, 2004

**PRIVILEGED SETTLEMENT
COMMUNICATION UNDER FRE 408**

BY FAX AND UPS

Henry C. Darmstadter, Esq.
Trial Attorney
Civil Trial Section, Western Region
PO Box 683
Washington, DC  20044

Re:    U.S. v. FDIC, et al
       Civil Action No. 02-1427 (USDC) D.D.C.

Dear Hank:

Attached to this letter, pursuant to your request, is the statement of our position on the $258 million interest deduction. As you can see, we agree with the FDIC. We think it is clear that the accrual of interest beginning in 1990 is compelled by the Dow Corning case. In this regard, contrary to the factual supposition in your December 19, 2003 letter, FDIC's claim was founded on a contractual right to interest, in that the FDIC was subrogated to the claims of the original holders of Benj.'s interest-bearing deposits.

The time has come for the parties to meet and determine whether the case can be resolved without litigation. We want to reach a settlement and not litigate. if this is possible, and are less concerned with theory than with obtaining an appropriate recovery for the shareholders. Thus. it is not necessary that a settlement acknowledge that Benj.'s FFA is not taxable. However, the settlement result will of course have to reflect the substantial litigation risks to the government on this issue, as well as on the others we have raised.

Henry C. Darmstadter
Page 2
April 14, 2004

We believe a settlement fixing the Benj. receivership's liability for taxes, interest and penalties at $12 million, for the tax years 1990 through 2002, is appropriate in light of all the circumstances. We request that a date be set now not later than May 15, 2004 for a settlement conference to consider this proposal.[1]

If you are not prepared to set such a date now, this letter is our notice that we will shortly update and reactivate our motion to intervene and transfer to the District of Oregon. In the event of litigation, we of course expect to raise all of the issues we have previously raised, i.e., not only the FFA and interest accrual issues but also the goodwill issue and the fact that the statute of limitations bars collection of tax and interest at this late date for a number of the years at issue. We would also plan to challenge the assessment of interest against the Benj. receivership in light of (i) the failure of the FDIC to make a tax payment or post a cash bond years ago to stop the running of interest and (ii) the inequity of assessing interest at a rate three percentage points above Treasury yields while the Benj. receivership was being credited with interest at Treasury bill rates on the funds being held by the government. We believe we have strong positions on all of these issues. Moreover, if we were to prevail on some or all of these additional issues, as well as on the FFA and interest accrual issues, the receivership's liability would be substantially below the $12 million figure we are offering.

Sincerely,

DON S. WILLNER & ASSOCIATES PC

Don S. Willner

DSW:rm
Encls.
cc: Catherine Topping, Esq.

---

[1] As you know, any settlement ultimately will need to be approved by a court, after notice to the shareholders.

### Shareholders' Position on Accrual of Interest Paid to FDIC

The Department of Justice ("DOJ") has asked for the views of the Benj. Franklin shareholders regarding the timing of the deductions for $258 million interest expense owed by the Benj. Receivership to RTC/FDIC corporate.

This interest expense was attributable to the advance of funds by the RTC to the Benj. receivership, after the September 7, 1990 inception date of the receivership, in connection with the assumption of Benj.'s deposit liabilities by the Bank of America. As a result of the advance the RTC and subsequently the FDIC became subrogated to the preexisting claims of depositors against the receivership. At the time of the advance and all subsequent times, the Benj. receivership was solvent, i.e., the value of all its assets exceeded the value of all its liabilities. Thus, there should never have been any doubt about the repayment of that advance. In fact, the advance was repaid over the period 1990 to 1995, and the interest was ultimately paid in 1997 and 1998.

The position of the shareholders (and of the FDIC) is that the $258 million of interest was deductible for federal income tax purposes as it accrued with the passage of time, beginning in 1990. In a December 19, 2003 letter to the FDIC, the Department of Justice raised the issue of whether the deductions should be deferred. DOJ's rationale was that the interest was not legally owed by the receivership unless funds were available to pay it, and that therefore the obligation to pay interest had to be viewed as a "contingent" obligation that could not support an accrual of interest until the contingency was removed. In a March 17, 2004 letter to DOJ, the FDIC explained that the legal obligation to pay the interest was not, in fact, contingent on the availability of distributable funds, and that therefore accrual of the interest expense beginning in 1990 was appropriate.

The shareholders believe the FDIC's analysis of this issue is correct and strongly support the analysis and conclusions set out in the FDIC's March 17, 2004 letter. Our additional analysis in support of this position is set out below.

### Analysis of Bankruptcy Law Analogy

DOJ's position appears to rest in large part on an application to the receivership, by analogy, of the law that has developed in the context of bankruptcies with regard to the accrual of interest after the filing of the bankruptcy petition. While we question whether this analogy is appropriate, we also believe that the bankruptcy law actually supports the position that the $258 million of interest expense in this case accrued beginning in 1990. We believe the court case that is most useful in understanding the principles that should be applied in bankruptcy cases is In re Dow Corning Corp., 270 B.R. 393 (E.D. Mich. 2001). In that case, the Bankruptcy Court considered the accrual of post-petition interest for federal income tax purposes on two types of pre-petition debt: (i) "Trade Debt" that did not contain any contractual provisions for interest and (ii) "Institutional Debt" that bore interest by its terms. Because the Trade Debt, by its own terms,

Shareholder's Statement on Interest Accrual
Page 2
April 14, 2004

did not provide for the payment of interest, the Court concluded that the source of the creditors' right to interest on the Trade Debt could only be section 726(a)(5) of the Bankruptcy Code, which provides for the payment of interest on claims against the estate to the extent funds remain after the payment of all higher-priority claims. Because the right to interest created by section 726(a)(5) is only a contingent right, the Court concluded that it could not, by itself, support the accrual of interest.

In contrast, the Institutional Debt considered in <u>Dow Corning</u> provided for interest by its terms. Thus, the creditors of the Institutional Debt had a right to interest that existed apart from section 726(a)(5). The Court held that this right was not cut off or invalidated by section 726(a)(5), and that therefore accrual of interest on the Institutional Debt was proper.

DOJ appears to recognize the importance of the <u>Dow Corning</u> case when it states in the December 19 letter that "we are unaware of any specific contractual terms which would require the Receivership to pay interest on the principal amount of the FFA to the RTC/FDIC. Accordingly, any legal obligation to pay interest on the FFA would likely be imposed under Title 12 and/or the applicable banking regulations." As explained below, however, such contractual terms existed. Thus, FDIC was in the same position as the holders of the Institutional Debt in <u>Dow Corning</u>.

As explained in the FDIC's March 17 letter, when the FDIC advanced funds to the receivership it became subrogated to the claims of depositors against the receivership. That is, as a legal matter it was treated as if it had directly paid off the depositors in cash, such that it "stepped into the shoes" of the depositors with respect to whatever claims the depositors had against the seized institution. In this regard, Benj.'s deposits were interest-bearing, i.e., its depositors had a contractual right to interest on their deposits. Attachment A to this statement is an excerpt from Benj.'s 1988 annual report (the last annual report that was prepared before Benj. was placed in conservatorship and, ultimately, receivership) indicating that all of Benj.'s deposit liabilities were interest-bearing, with a "weighted average contractual interest rate" of 7.63%. Thus, the depositors' rights to which the FDIC succeeded included this pre-existing right to interest. There is nothing in Title 12 or the regulations thereunder that abrogates this right to interest.[2] Accordingly, the accrual of this interest for federal income tax purposes beginning in 1990 is correct.

<u>Receivership's Ability to Pay Interest</u>

In any event, even if it were correct to view the Benj. receivership's legal obligation to pay interest as being contingent on the availability of sufficient funds, it would still be proper to accrue the interest paid to the FDIC beginning in 1990. As explained in detail in our March 17, 2003 submission on the nontaxability of the RTC's advances to the Benj. receivership, the

---

[2]    The regulations do, however, limit the rate of interest to the average rate on certain short-term U.S. Treasury bills. 12 C.F.R. § 360.3(b).

Shareholder's Statement on Interest Accrual
Page 3
April 14, 2004

receivership had at its inception assets that were more than sufficient to pay off all its liabilities. Moreover, the financial position of the receivership strengthened further with the passage of time, such that today it has a substantial surplus after repaying the FDIC its advances and the full amount of the $258 million in interest.  In short, it was apparent at all times that the receivership would have sufficient funds to pay the $258 million in interest.  Thus, there was no real "contingency" affecting its payment.



The
Benj Franklin
Federal
Savings
And
Loan
Association

Annual Report
1988

007459

Note 8—DEPOSIT ACCOUNTS:

| Balances by interest rate | December 31, | | | |
|---|---|---|---|---|
| | 1988 | | 1987 | |
| | (dollars in thousands) | | | |
| Negotiable order of withdrawal accounts: (5.00% at December 31, 1988, 5.25% at December 31, 1987) | $ 186,670 | 5.7% | $ 185,008 | 6.3% |
| Variable rate—5.15% at December 31, 1988 and 5.15% at December 31, 1987) | 40,555 | 1.2 | 48,508 | 1.6 |
| | 227,225 | 6.9 | 213,514 | 6.9 |
| 5.50% passbook and statement accounts | 264,263 | 8.7 | 274,523 | 8.9 |
| Money market savings accounts (variable rate, 5.50% to 6.50% at December 31, 1988; 5.20% to 6.00% at December 31, 1987) | 228,704 | 7.0 | 277,379 | 9.1 |
| Certificate accounts: | | | | |
| 6.00% and lower | 551 | — | 43,032 | 1.4 |
| 6.01% to 7.00% | 236,851 | 7.2 | 751,077 | 24.1 |
| 7.01% to 8.00% | 1,179,679 | 36.0 | 842,091 | 27.4 |
| 8.01% to 9.00% | 610,572 | 18.7 | 221,537 | 7.2 |
| 9.01% to 10.00% | 183,650 | 5.6 | 71,286 | 2.3 |
| 10.01% to 11.00% | 114,502 | 3.5 | 153,412 | 5.0 |
| 11.01% to 12.00% | 170,902 | 5.2 | 184,919 | 6.0 |
| 12.01% to 15.00% | 24,747 | 0.8 | 27,720 | 1.0 |
| | 2,521,454 | 77.0 | 2,295,074 | 74.7 |
| Accrued interest payable on money market and certain negotiated certificates | 12,023 | 0.4 | 11,930 | 0.4 |
| | $3,273,669 | 100.0% | $3,072,917 | 100.0% |
| Weighted average contractual interest rate on deposits at period end | 7.63% | | 7.32% | |

Certificate account maturities were:

| Maturity | December 31, | |
|---|---|---|
| | 1988 | 1987 |
| | (in thousands) | |
| 1 month to 1 year | $1,457,768 | $1,369,350 |
| Over 1 year to 2 years | 332,564 | 139,379 |
| Over 2 years to 3 years | 200,675 | 252,719 |
| Over 3 years to 4 years | 42,160 | 46,219 |
| Over 4 years to 5 years | 182,559 | 177,882 |
| Thereafter | 305,728 | 309,725 |
| | $2,521,454 | $2,295,074 |

007432